**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **CATHY CROWNOVER,** | § | Civil Action No. 2:18-cv-02577-RMG-MGB |
| | § | |
| *Plaintiff,* | § | **COMPLAINT** |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, d/b/a SANTEE COOPER,** | § | **TITLE VII DISCRIMINATION** |
| | § | |
| | § | **EQUAL PAY ACT** |
| | § | |
| *Defendant.* | § | |

COMES NOW, Plaintiff Cathy Crownover, by and through undersigned counsel, complaining of the Defendant herein, and alleging as follows:

## INTRODUCTION

Cathy Crownover, a female, worked for 34 years with Defendant Santee Cooper ("Santee Cooper"), which state agency has been recently described by the Governor of South Carolina, Henry McMaster as:

- "[a] rogue state agency not abiding by the law;"

- "operating outside the law;"

- "[an] egregious situation;"

- "[Santee Cooper's] actions are absurd and unlawful;"

- "we're having difficulty getting the facts because Santee Cooper will not give us the facts;"

- "the executives leading that agency . . . are opposed to transparency and accountability, and this is just one more example;"

- "[a] revolving disaster of unaccountability and obstruction, and now we have yet another example," and

- "Santee Cooper has just got to obey the law;"[1]

She has been stuck in her position (and pay) of Stores Specialist since 1994 when she began pursuing the various procedures Santee Cooper required of her to achieve pay commensurate with her actual work, what male employees at Santee Cooper took for granted. In sum, Santee Cooper has engaged in a long term, continuous pattern of illegally and unfairly disfavoring women like Crownover on pay, benefits, promotion and other elements of employment, as compared to younger and male colleagues.

In 2012 Crownover began a five year stint at Santee Cooper under South Carolina's now-defunct TERI program. At all times she was an outstanding performer. After Crownover filed an EEOC charge, Santee Cooper finally reclassified her and her colleagues' positions in 2017, *but this did not take effect until the month immediately following Crownover's last day, so she didn't benefit one iota.* Now Crownover receives retirement benefits based on her discriminatorily low wages—a monthly reminder of the futility of her inordinate patience and cooperation in her attempts at just pay, and of the irony that job promotion changes she fought for would benefit only those who come after her.

**PARTIES**

1.     Plaintiff Cathy Crownover ("Crownover") is a citizen and resident of Berkeley County, South Carolina.

---

[1] Press Conference, August 20, 2018, can be found:
https://www.wltx.com/article/news/local/Santee Cooper-cooper-is-a-rogue-agency-governor-henry-mcmaster-says/101-585810367

2.    Defendant South Carolina Public Service Authority, d/b/a Santee Cooper ("Santee Cooper"), is a South Carolina-owned utility and public agency with its principal office in Berkeley County, doing business throughout South Carolina.

## JURISDICTION & VENUE

3.    This Court has personal jurisdiction over Santee Cooper because the cause of action arose within this District as a result of Santee Cooper's conduct within this District.

4.    This Court has subject matter jurisdiction over the Title VII and EPA claims pursuant to 28 U.S.C. § 1331 as this is an action arising under 42 U.S.C. § 2000e-2 and 29 U.S.C. § 206(d), respectively.

5.    Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391 because this is a judicial district where a substantial part of the events or omissions giving rise to the claim occurred and because Defendant has its headquarters in and conducts business in this District.

## FLSA (EPA) COVERAGE

6.    At all material times, Defendant has been an employer within the meaning of section 203(d) of the FLSA, which is defined to include "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d).

7.    At all material times, Defendant has been a public agency within the meaning of section 203(x) of the FLSA, which is defined to include "the government of a State or political subdivision thereof; any agency of . . . a State, or a political subdivision of a State." 29 U.S.C. § 203(x).

8.    At all material times, Defendant has been an enterprise in commerce or in the production of goods for commerce within the meaning of section 203(s)(l) of the FLSA because Defendant's enterprise is the activity of a public agency. 29 U.S.C. § 203(s)(1)(C).

9.    At all material times, Plaintiff was an employee of an enterprise that engaged in commerce or in the production of goods for commerce as required by section 206 of the FLSA. 29 U.S.C. §§ 203(e), 206(a).

10.    Therefore, at all material times relevant to this action, Defendant was an enterprise covered by the FLSA, and as defined by 29 U.S.C. §§ 203(r) and 203(s).

## TITLE VII COVERAGE

11.    At all relevant times, Defendant was an employer continuously employing fifteen or more employees for each working day in each of the twenty or more calendar weeks in the current or preceding calendar year, in an industry affecting commerce, and is subject to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.    Within 300 days of the acts complained of herein, Plaintiff filed a Charge of Discrimination (415-2017-00070) with the EEOC which issued Plaintiff a "Right to Sue" letter on June 22, 2018, received several days later by Crownover, that stated:

> You may file a lawsuit against the Respondent under federal law within 90 days of the date of your Dismissal and Notice of Rights.

13.    Plaintiff has timely filed this action within 90 days of the date of her Right to Sue letter's issuance, though she is only required to file within 90 days of actual receipt.

4

**FACTUAL ALLEGATIONS**

Plaintiff's Job

14.     After Santee Cooper hired Crownover—a woman—in or around September of 1983 as a general clerk, it promoted her to the position of Stores Specialist ("SS"), in the System Substation Maintenance division ("SSM"), sometime in June or July of 1992. Crownover remained in this division until her last day of work on June 30, 2017.

15.     Sometime in the spring of 2017—after Crownover filed her EEOC charge—Santee Cooper changed the job titles and promotion tracks for SS'es, including SS-SSM's, and made Crownover a Logistics and Inventory Control Specialist "A" ("LICS-A"), the highest rung on the promotion track that has "A," "B," and "C," but junior to the Senior Logistics and Inventory Control Specialist position ("Senior LICS"). Crownover's duties did not change with this change in job title.

16.     For the several years leading up to her last day, her duties consisted of the following items from her written job description:

        (a)     Responsible for daily operation of self-sustaining specialty warehouse;

        (b)     Compiles information and catalogs items into Corporate Material Management System;

        (c)     Plans, schedules, orders, expedites, receives and inspects all stock and non-stock material;

        (d)     Maintains accurate records of purchase receipts, equipment, warranties, etc. for Internal Audit, OSHA, and management;

        (e)     Provides assistance to Superintendent, Engineers, Technical Supervisors, Technicians, and internal/external customers;

5

(f)     analyzing and forecasting material needs of substation maintenance operations in order to order and stock cost-effectively;

(g)     add, delete, and maintain inventory according to corporate guidelines;

(h)     perform inventory spot checks/cycle counts to comply with Internal Audit guidelines;

(i)     maintain accurate level of stock by expediting replenishment orders through DRP, Requisition, or LPO's;

(j)     coordinate with Purchasing emergency material needed due to equipment failures;

(k)     issue stores materials required to support Substation operations;

(l)     enters all transactions into Oracle Inventory System promptly and accurately;

(m)     transfer stock to various Generation and Distribution warehouses;

(n)     issue material orders to Central Warehouse for stocked items and transport to shop;

(o)     expedite orders, receive non-stock material required by technicians to perform repairs and maintenance of equipment;

(p)     assist technicians with substation equipment such as transformers, circuit breakers, battery banks and chargers, heating and air conditioning equipment, conduit, etc.;

(q)     meet with suppliers to identify parts; understand nature of problems and communicate problems for quick resolution; deliver parts to substation locations system-wide;

(r)     arrange with vendors for Return Material Authorizations;

(s)     issue Shipping Authorities, prepare items for shipping and deliver to UPS location all repairable inventory items, test equipment, and special equipment;

(t)     maintain records on repairs and warranty agreements;

(u)     provide MSDS sheets on products used in department;

(v)     general awareness/familiarization of transporting hazardous material and proper format when processing Straight Bill of Lading forms required by Department of Transportation to prevent fines;

(w)     knowledge of how to handle an emergency should one occur;

(x)     record and process invoices for HVAC repairs, AC/DC surge protectors, and fire extinguishers;

(y)     maintain records of equipment in substation control houses to insure that OSHA safety requirements are met;

(z)     work closely with Security, distributing substation locks used system-wide;

(aa)     forecast specialty gas used by departments on Blanket Order, to have correct gas available as well as amount on hand to minimize downtime;

(bb)     maintain hand and power tools used in section;

(cc)     process P-card transactions in Paris for departmental chargers, maintaining accurate file of receipts for future audits;

(dd)     assign, prepare, and process LPO's;

(ee)     data entry of Timesheets and Automotive Reports for Technicians;

(ff)     prepare Material Disposals and await final disposition; with final disposition update inventory;

7

(gg)     assist in compiling information for Executive Summary;

(hh)     assist Superintendent in preparation and entry of sections budget;

(ii)     prepare other reports as required;

(jj)     maintain Pagers for unit;

(kk)     provide point-of-contact for incoming telephone calls: receive trouble calls and contact via radio so appropriate action can be taken;

(ll)     maintain location of employees in field;

(mm)     provide dispatch employee data on personnel for "On-Call" and "Emergency" situations;

(nn)     prepare and process temporary employee hours;

(oo)     coordinate with agencies which furnish these temporary employees for replacements as required;

(pp)     distribute section mail; and

(qq)     obtain office supplies needed within the section.

17.     In addition, her actual duties during at least her last several years included the following:

(a)     maintaining and operating the specialty Substation Maintenance warehouse in Columbia that was established in 2008;

(b)     continuing support and cooperation with the Myrtle Beach Substation Maintenance warehouse which Crownover established in 2002; and

(c)     those Senior SS's duties described below (see "Plaintiff's Male Comparators—Senior SS's".

8

18.    In 2016, the pay range of the SS Substation Maintenance ("SS-SSM") was $15.40--$23.15. Crownover's wage was $23.15.

19.    In 2017, before her job title change to LICS, the pay range for an SS-SSM was $15.85—$23.80. Santee Cooper said that she was not eligible for this new pay range because they were shifting the effective date for increases in pay ranges to July of each year, instead of the January of each year, as had been Santee Cooper's custom. In 2017 the most she made as an SS-SSM was $23.15.

20.    The pay range for an LICS-A during the time just before Crownover's last day was $19.50—$29.25; again, Crownover's pay remained $23.15.

21.    Crownover's job as SS-SSM and LICS-A required skill, effort, and responsibility to do the above duties equal to that required by the jobs of her male comparators as described below, and her working conditions—primarily indoors and in a warehouse, in a full-time, day-shift job, were similar to those of the aforesaid male comparators.

22.    Over her career, Crownover consistently performed well in her position (including an overall performance rating of "Excellent" for 2015), resulting in her making, for at least the year 2016, the maximum wage Santee Cooper pays in her position. She continued to meet Santee Cooper's legitimate expectations until her last day of work.

Plaintiff's Male Comparators—Technical Associate Clarence B. Jeffcoat, Jr.

23.    During at least a major portion of Crownover's career—including during the last five years of her career—Santee Cooper had certain other positions, including some particular Technical Associate positions, which had the same job duties as Crownover's but paid better than her position. Not surprisingly, these positions were significantly male-dominated.

24.     Clarence B. Jeffcoat, Jr. ("Brad"), the son of father Clarence B. Jeffcoat—a long-time Santee Cooper generating station manager—and his mother who was a Santee Cooper cashier, began working as an SS at Santee Cooper's Moncks Corner campus on June 14, 1993.

25.     Santee Cooper promoted Brad to a Senior SS sometime, on information and belief, after September of 1999. As a Senior SS, Brad did the same work as Crownover but for higher pay.

26.     Santee Cooper next promoted Brad to Technical Associate—Inventory (Generation Department) sometime in 2015, and Brad has held this position ever since. In this position Brad again did the same work as Crownover but for higher pay. He worked both at plant warehouses (e.g., Cross and Jeffries generating stations) and at a corporate office (Moncks Corner).

27.     Brad's pay—based on information indicating that at least one Technical Associate earns $31.60 per hour, has always exceeded Crownover's pay. His precise pay is not known, but Plaintiff prays for initial discovery into this subject. His approximate hourly pay in 2016 was $24.78 (which exceeded Crownover's).

28.     Brad's duties, according to the job description revised in January of 2015, are as follows:

        (a)     Responsible for providing consultation and coordination of generating station stores functions;

        (b)     Catalogs items into the FIS Oracle Inventory System following established departmental and corporate procedures;

        (c)     Performs various material management activities such as DRP planning and requisition, blanket order planning, material analysis, spot checks, material transfers, obsolete/excess material disposal, inventory centralization, procedure development, reports, etc.;

10

(d)    Conducts inventory spot checks at generating station warehouses; and

(e)    Manages generating station tools using the Tool Management System (TMS).

29.    The position's required education is a high school diploma or GED; its required experience is two years, with two years' experience as a mechanic, technician, or stores specialist preferred.

30.    These educational and experiential requirements mirrored those for Crownover's SS-SSM job.

31.    The only two special skills required for Brad's job were, according to the job description:

(a)    Must possess good oral/written communications, technical, and administrative skills; and

(b)    Must be familiar with mechanical and electrical items used in a generating station.

32.    Crownover's job required these same skills.

33.    The equipment used in Brad's job was, according to the job description: Must be proficient in the use of personal computers (Windows operating system), Microsoft Office software, calculator, copier, and telephone.

34.    Crownover's equipment included these same items and some additional ones: Oracle/DRP, Maximo, and Citrix.

35.    On information and belief, certain other male Technical Associates and male Technical Assistants, during at least the last three years, performed the same work as Crownover but were paid more, and Plaintiffs pray for initial discovery into these positions.

11

Plaintiff's Male Comparators—Senior SS's

36.    Throughout most of her career as an SS-SSM, including at least the last five years, Crownover did the work of a Senior SS but was paid as an SS.

37.    The duties of a Senior SS were, according to one Senior SS job position:

(a)    Support station operations by maintaining an adequate level of materials, tools, and supplies required for continued operations;

(b)    Issue stores materials required to support station operations and maintenance;

(c)    Enter all transactions into the FIS Oracle Inventory System promptly and accurately; and

(d)    Manage generating station tools using the Tools Management System (TMS).

38.    Crownover's actual duties included these Senior SS duties, and the skills, effort, and equipment required for the Senior SS job were the same as what Crownover's job required.

39.    Male Senior SS's performing these same duties were—on information and belief and based on the general fact that Senior SS's had a higher pay range than SS's—paid more than Crownover. Male Senior SS's included Derrick Dawsey, Derrick Griffin, David Guerry, Richard Hinson, and Stephen Stewart. Plaintiff prays for initial discovery into the duties and pay of each male Senior SS and Senior LICS.

Plaintiff's Male Comparators—Senior LICS Tony Metts

40.    Tony Metts ("Metts") replaced Crownover as LICS—A upon Crownover's last day in June of 2017.

41.     In approximately November of 2017, Santee Cooper promoted Metts to Senior LICS. Upon information and belief, Metts's duties—both as an LICS-A and as a Senior LICS—did not differ from Crownover's.

42.     The pay range for a Senior LICS during the time just before Crownover's last day was $21.65--$32.50, which is a higher range than Crownover's was during the period up to her last day.

43.     Upon information and belief, Santee Cooper paid Metts more than Crownover when Metts was an SS-SSM, LICS, and then a Senior LICS.

44.     Metts's work as an SS-SSM, LICS, and a Senior LICS required skill, effort, and responsibility equal to that of Crownover, and in working conditions similar to those of Crownover, since Metts worked in the same physical location as Crownover did, and since his duties were the same as Crownover's.

45.     Plaintiff prays for initial discovery into the duties and pay of each male Senior SS and Senior LICS.

Santee Cooper's Retirement System (based on the Pay Disparity)

46.     Crownover's retirement benefit is based on her highest-earning twelve consecutive quarters.

47.     Crownover's highest-earning twelve consecutive quarters are based on her being paid less than her male comparators for doing equal work.

48.     Had Santee Cooper paid her either as a Senior SS, a Senior LICS, or as a Technical Associate, at wages equal to her male comparators, Crownover's retirement benefit would be greater on every instance of her receiving a retirement benefit payment over the lifespan thereof.

49.    In other ways Crownover's retirement benefit was adversely affected by not being paid equally to her male counterparts, due to Santee Cooper's violations of law, including that she was paid a percentage of her unused sick leave and vacation days the value of which was based on her discriminatorily low hourly wage.

<u>Adverse Employment Decisions (and Plaintiff's contemporaneous good performance)</u>

50.    Starting since at least 1994—and because her work as an SS-SSM was less like other SS's and more like higher-paid Technical Associates or Senior SS's—Crownover had attempted to get her immediate supervisor to have management effect an increase in her pay (besides the usual merit-based raises)—or job title change that would bring the opportunity for promotion; however, Santee Cooper always dragged its feet, never effecting any change, always communicating to Crownover in a way that conjured the "Impossible Yes": that the time "wasn't good," or "change will come soon," or the situation when meeting with management "wasn't right." Every year during annual reviews—with Crownover always receiving very good or excellent reviews—Santee Cooper would anew consider—but ultimately do nothing with—her ongoing requests to be either promoted to a Senior SS or renamed something else, such as Technical Associate, that paid her for her actual work.

51.    Generally, Santee Cooper's process for recognizing Crownover's actual duties, despite her Stores Specialist title, was either to promote her or to "slot for benchmarking" certain job titles and to hire consultants to assist in determining the proper job titles, promotion tracks, and pay ranges with due regard for the wider industry. Human Resources would field input from employees' operational supervisors for which positions to "slot" for this "benchmarking." These Individual Defendants   This process was made available to Crownover, and requested by

14

Crownover and her immediate supervisors, in each of the adverse decisions alleged below, but Santee Cooper denied her request, never benchmarking her job based on her actual work.

52.     Despite this pattern of ongoing requests and Crownover's follow-ups on those requests, Santee Cooper never granted them or took action on them.

### *The Senior Stores Promotion Requests*

53.     During all of Crownover's career, Santee Cooper also had a Senior Stores Specialist ("Senior SS") position which paid better than Crownover's wage as an SS.

54.     Senior SS's existed in several of Santee Cooper's departments and divisions, but not in Crownover's division, SSM.

55.     Since at least 1994 Crownover requested to be promoted to a Senior Stores Specialist because her actual duties resembled those done by Senior SS's and differed from other SS's in Santee Cooper, and also because her excellent performance merited a promotion, in her supervisors' opinions. This was an ongoing request that Santee Cooper revisited every year, with Crownover and her immediate supervisor annually revisiting with management. Since 2014 her immediate supervisor Jim Waddill had liaised with upper management and HR in pursuit of Crownover's requests.

56.     Santee Cooper always denied her request, originally telling her that such a promotion was not available because neither of two requirements were met: (1) that each warehouse could have a maximum of one Senior SS; or (2) that the warehouse at issue be a "stand-alone" warehouse. Later, various excuses were given, as described above in the Impossible Yes discussion. These denials came from decisions made by, on information and belief, each of the Individual Defendants.

15

57.     At least since sometime between 1994 and 2000, Santee Cooper recognized that Crownover's warehouse was a stand-alone warehouse; however, at no time did Santee Cooper or the Individual Defendants ever promote Crownover to a Senior SS. Santee Cooper and the Individual Defendants denied Crownover a pay increase despite her having met one of its criteria.

58.     At no time was there a Senior SS at Crownover's warehouse. Santee Cooper and the Individual Defendants denied Crownover a pay increase despite her having met the other of its criteria. Crownover would have been the "one maximum" Senior SS, and she would've been such at her "stand-alone" warehouse.

59.     After Santee Cooper created, in early 2017, the LICS family of jobs (LICS-A, -B, -C, and Senior LICS) and eliminated the Stores Specialist and Senior Stores Specialist titles, Santee Cooper and the Individual Defendants merely deemed Crownover an LICS-A and not a Senior LICS—essentially, again denying her ongoing efforts to be deemed a Senior SS (and Senior LICS).

### *The Technical Associate Title-Change Requests*

60.     One of the more recent iterations of the Impossible Yes was over the course of 2014 to her last day. In September of 2014 Crownover's supervisor Waddill met with Santee Cooper's HR personnel responsible for Employee Compensation, including on information and belief Brenna Svagerko and Sharon Wilcox, to discuss Crownover's situation. Santee Cooper told Crownover to expect to see a change to her job title and thus pay starting in mid-2015 and reflected in her 2015 annual evaluation cycle which process lasted from November of 2015 to the first several weeks of 2016; however, no change occurred during this timeframe. Santee Cooper told Crownover that they'd continue to work on her request.

16

61.     Over March and April of 2017, after Crownover learned of the planned change in her job title from SS to LICS, she requested to her immediate supervisor Jim Waddill that he meet with HR and his managers in order to have her slotted not as an LICS but as a Technical Associate. She gave Waddill Brad's Technical Associate's job description so he could use it at the meeting.

62.     Waddill met with Santee Cooper personnel, first with HR's compensation staff which included Ken Lott, Victoria Chancer, and Bob Ebling; then he met with operations-managerial staff including Adam Taylor, Will Beasley, Bridget Coffman, and Tom Perry; but at neither of these meetings was Crownover's request considered, and nothing was done with Brad's job description.

63.     Crownover thus became an LICS instead of a Technical Associate, despite doing (and having done, for years) equal work as Brad, the Technical Associate.

### The Disparate Impact on Female Stores Specialists

64.     Most of the similarly situated SS'es to Crownover (since not *all* SS'es did the same work), which includes those in the Department "Transmission Technical," were women and were paid less than Crownover's comparators who included at least one Technical Associate and one Senior SS and who were predominantly men.

65.     The aforementioned practices of Santee Cooper—to deny Crownover's pay-increase requests and to keep her in her SS (and, right at the end, her LICS-A) position—disparately impacted those female SS's, including Crownover, who performed the same work as their male counterparts with higher pay and/or different job titles and promotion opportunities.

17

## COUNT I—SEX DISCRIMINATION
### *(Title VII)*

66.     Each and every allegation set forth hereinabove is hereby repeated as if fully incorporated herein.

### Disparate Treatment (Mixed-Motive)

67.     Illegal sex discrimination motivated Defendant's adverse employment decisions which included:

(a)     denying Crownover's ongoing, continuous request to be promoted to a Senior SS (and Senior LICS);

(b)     denying Crownover's ongoing, continuous request to be renamed a Technical Associate;

(c)     paying Crownover less than what others made for doing the same work; and

(d)     denying Crownover's ongoing, continuous request to be considered differently from other Stores Specialists by being "slotted for benchmarking" so that her job description would reflect her actual duties, and so that her pay was commensurate with her actual duties and with the wider industry.

68.     Each of these violations was continuous in nature and each of Crownover's discriminatorily unequal paychecks was its own violation. Each of Crownover's retirement payments, based on her discriminatory pay, is its own violation as well.

### Disparate Treatment—Prima Facie Case

69.     Plaintiff is a member of a protected class: women.

18

70.     Plaintiff suffered the adverse employment actions described above in this count's subsection, "Disparate Treatment—Mixed Motive."

71.     Plaintiff was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment actions. She always received very good or excellent performance reviews.

72.     Plaintiff's position was filled by Tony Metts, a man who was a similarly qualified applicant outside the protected class. Within several months Santee Cooper paid Metts more than Crownover had earned and promoted him to a Senior LICS, in which position Metts performed the same duties as Crownover.

**Disparate Effect**

73.     Defendant used particular employment practices that caused and cause a disparate impact on the basis of sex, including the following:

(a)     Promoting male employees in Crownover's Substation Maintenance Division, but not the female SS-SSM's, despite there being a common procedure for effecting promotions for all of these employees, and despite Crownover complying with said procedure (having her immediate supervisor submit to HR a letter requesting a promotion/pay raise):

(b)     Having female SS-SSM's perform duties that were common to Senior SS's and Technical Associates—both of which job titles were predominantly men—but paying them less;

(c)     Giving males performing the same duties as Crownover different job titles (e.g., Technical Associate) that bring higher pay and promotion-opportunity;

(d)     Relocating those males performing the same duties but making more money to offices instead of warehouses in order to curb resentment and complaints by female SS's (e.g., Brad's move from generating station warehouses to an office space in Moncks Corner after his female SS colleague(s) complained to management; Brad Ulmer, as a Senior SS, working at the same Moncks Corner office instead of at a warehouse); and

(e)     Soliciting submissions and requests from female SS's pertinent to the determination of paying them differently (e.g., for promotion to Senior SS or for title-change to Technical Associate, or for slotting SS-SSM's for benchmarking), but failing to consider those submissions and requests upon receipt, all to keep up the Impossible Yes and string such females along with the illusion that if the proper procedures were followed, change would come.

74.     The disparate impact occurred with each paycheck to female SS-SSM's who performed the same work as male comparators (e.g., Senior SS's, Senior LICS's, Technical Associates) but earned less. The disparate impact has continued and will continue with each retirement payment to Crownover that is based on her inferior pay due to Santee Cooper's sex discrimination.

75.     Alternatively, Defendant maintains a policy and practice of granting preferential treatment to men at the expense of women. Plaintiff was denied promotion and title-changes and opportunities for higher pay at least in part due to said policy and practice.

76.     Plaintiff suffered harm and damages directly and proximately caused by Defendant's discrimination complained of herein, in an amount to be proven at trial by jury.

77.     Furthermore, Defendant intentionally and/or with reckless indifference, engaged in the above stated discriminatory practices against Plaintiff, contrary to Plaintiff's federally

20

protected rights as guaranteed to her under Title VII and 42 U.S.C. Section 1981a, and Plaintiff is entitled to injunctive relief and compensatory damages thereunder.

78. Santee Cooper has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year.

79. Plaintiff hereby respectfully requests actual and compensatory damages from Defendant for the unlawful conduct described herein, and equitable relief, all in an amount to be determined in a trial by jury.

## COUNT II—VIOLATION OF EQUAL PAY ACT
### *(29 U.S.C. § 206(d))*

80. Each and every allegation set forth hereinabove is hereby repeated as if fully incorporated herein.

81. Defendant has paid different wages to employees of opposite sexes.

82. Plaintiff and her opposite-sex comparators performed equal work in jobs which require equal skill, effort, and responsibility, and which are performed in similar working conditions, all as described above.

83. Each of Crownover's paychecks was its own violation of the EPA.

84. Each of Crownover's retirement payments was, and will continue to be, its own violation of the EPA.

85. Each of Defendant's violations of the EPA was willful.

86. Plaintiff demands all damages available under the EPA including liquidated damages.

## PRAYER FOR RELIEF

87. WHEREFORE, Plaintiff respectfully prays for judgment against Defendant, and for legal, equitable, compensatory, special, consequential, and punitive damages, including

21

injunctive relief to curb Santee Cooper's discrimination, and including front pay and back pay and liquidated damages, tangible and intangible damages (such as emotional suffering, mental anguish, and loss of enjoyment of life), together with the costs of this action and attorneys' fees, as provided by federal law, prejudgment and postjudgment interest, and for such other and further relief as this Court may deem just and proper.

88.    Plaintiff requests that these claims be tried by a jury.


Dated:  September 19, 2018.

s/Scott Riddell
Ben LeClercq SC BAR # 65754
Federal Bar # 7453
Scott Riddell SC BAR # 102809
Federal Bar #12543
Le Clercq Law Firm, PC
Ben@LeClercqLaw.com
Scott@LeClercqLaw.com
708 South Shelmore Blvd. #202
Mount Pleasant, SC 29464
Phone (843) 722-3523
Fax (843) 352-2977
*Counsel for Plaintiff*